

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-5-1997

# Love v. Morton

Precedential or Non-Precedential:

Docket 96-5783

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Love v. Morton" (1997). *1997 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 5, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5783

HAROLD LOVE

v.

WILLIS MORTON, Administrator-NJSP;
PETER VERNIERO,* Attorney General,

Appellants.

Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 95-cv-06309)

Argued: Tuesday, March 25, 1997

Before: SLOVITER, Chief Judge, STAPLETON and
ALDISERT, Circuit Judges.

(Filed May 5, 1997)

Jack J. Lipari (argued)
Jeffrey S. Blitz
OFFICE OF PROSECUTOR OF
ATLANTIC COUNTY
1470 19th Avenue
P.O. Box 2002
Mays Landing, NJ 08330

 ATTORNEYS FOR APPELLANTS

_____

*[Pursuant to Rule 43(c) of F.R.A.P.]

Stephen M. Latimer (argued)
LOUGHLIN & LATIMER
9 Kansas Street
Hackensack, NJ 07601

 ATTORNEY FOR APPELLEE

**OPINION OF THE COURT**

ALDISERT, <u>Circuit Judge</u>

This appeal by the State of New Jersey from a judgment of the district court granting Harold Love's 28 U.S.C. § 2254 petition for writ of habeas corpus requires us to decide whether the court properly ruled that Petitioner had been placed in former jeopardy prior to his trial and conviction for robbery in state court.

Love defended in two state court trials on charges of robbery and armed robbery. At the close of testimony on the first day of his first trial, the trial judge declared a mistrial for personal reasons. The next day, a second trial began before another judge and a second jury. The new trial judge denied Love's motion to dismiss the indictment on grounds of double jeopardy. Following his conviction and sentencing, Love unsuccessfully appealed to the state appellate court on the double jeopardy issue. <u>State v. Love</u>, 282 N.J. Super. 590, 660 A.2d 1246 (App. Div. 1995) (per curiam). Love then filed a habeas corpus petition in district court. After conducting an evidentiary hearing, the district court ruled that Love's first trial was terminated without his consent and without manifest necessity. The court granted Love's petition on the basis of double jeopardy. <u>Love v. Morton</u>, 944 F. Supp. 379 (D.N.J. 1996). The State of New Jersey has appealed.

At stake here are protections assured by the Double Jeopardy Clause of the Fifth Amendment, which provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." As the Supreme Court teaches:

2

The constitutional protection against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. In his Commentaries, which greatly influenced the generation that adopted the Constitution, Blackstone recorded:

". . . the plea of auterfoits acquit, or a former acquittal, is grounded on this universal maxim of the common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence."

Green v. United States, 355 U.S. 184, 187 (1957) (citing 4 William Blackstone, Commentaries 335).

The Double Jeopardy Clause not only ensures the finality of criminal judgments, but also protects a defendant's "valued right to have his trial completed by a particular tribunal." Arizona v. Washington, 434 U.S. 497, 503 (1978) (quoting United States v. Jorn, 400 U.S. 470, 484 (1971)). As urged by New Jersey, however, this "valued right . . . must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 689 (1949). Accordingly, the Supreme Court has crafted certain exceptions to the literal language of the Clause. New Jersey presented two of these exceptions to the district court and urges them upon us here.

Mistrials declared with the defendants' consent do not bar a later prosecution. United States v. Dinitz, 424 U.S. 600, 607 (1976). Even without their consent, defendants may be retried when, "taking all the circumstances into consideration, there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated."1 United States v. Perez, 22 U.S. (9 Wheat.) 579,

_____

1. New Jersey relies on "manifest necessity" because the phrase "ends of public justice" is not applicable to the facts of this case. See Illinois v. Somerville, 410 U.S. 458, 468-471 (1973) (holding that the ends of public justice justify a mistrial where the trial contains a defect such that a conviction, if obtained, could be upset at will on appeal or in collateral proceedings).

3

580 (1824) (Justice Story coining the phrase "manifest necessity"). Our task is to decide whether there was manifest necessity for declaring the mistrial and whether Petitioner expressly or impliedly consented to the mistrial. New Jersey also argues that the court erred in conducting an evidentiary hearing in the § 2254 proceeding. The district court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. § 1291. The appeal was timely filed under Rule 4, Federal Rules of Appellate Procedure.

Where a district court holds an evidentiary hearing in a habeas proceeding, this court reviews the district court's findings of fact for clear error. Lesko v. Owens, 881 F.2d 44, 50-51 (3d Cir. 1989). We exercise plenary review over the district court's legal conclusions. Yohn v. Love, 76 F.3d 508 (3d Cir. 1996).

I.

Love stood trial in the Atlantic County, New Jersey Superior Court in two trials before two juries on charges of robbery and armed robbery. The first jury was sworn and testimony began on the morning of June 15, 1993. During the testimony of the State's fourth witness, the jury was excused so that counsel could argue an issue relating to "chain of custody." Counsel and the trial judge, James Citta, repaired to chambers to discuss the matter. At about 3:30 p.m., the judge received a telephone call from his wife, who was exceedingly upset because her mother had died unexpectedly. The judge later testified that he was close to his mother-in-law and was upset not only at her untimely passing, but also at his inability to be immediately available to comfort his wife. The prosecuting attorney testified that Judge Citta was "very upset" and "visibly shaken." Judge Citta called the presiding criminal judge, Judge Braithwaite, and briefly discussed the situation.

The prosecutor has described the events that took place in Judge Citta's chambers after the call from the judge's wife:

We waited for him to get off the telephone, and he explained to us that, as I indicated, his wife was very

4

distraught that her--her mother had died suddenly and unexpectedly and she had been unable to reach anyone. He further indicated that he was an hour away from home and that he had to leave. He had to get out of here and go home and so forth, and it was apparent there was stress on his face and in his demeanor and his voice and so forth that he--there was an urgency to his need to leave the courthouse. He said that `I don't know what I'm going to do about this case. I don't know if we'll mistry it or not. I'm not sure what the procedure should be. I'm going to call Judge Braithwaite,['] which is what he did. He phoned Judge Braithwaite in our presence. He discussed the situation with Judge Braithwaite including the fact of the State's witnesses having just arrived from Canada yesterday afternoon and then--that there being some wish on the part of the State that the case proceed, whether that could be effected through the assignment of another judge to pick up the case from that point on or to start the case anew, whatever; but he discussed the matter with Judge Braithwaite; and after he got off the telephone, he advised us that he was going to mistry the case. Now, needless to say, counsel and I in that position were in the situation where we both had an interest in the case proceeding from that point on, but neither of us was in a situation where we could tell Judge Citta `Forget your wife and forget your mother-in-law's death. Let's get on with this trial.' I mean there was an urgency and an emergent situation here that none of us had previously encountered.

State v. Love, 660 A.2d at 1248-1249.

Judge Citta testified at the evidentiary hearing in the district court that he did not remember asking counsel for their input or consent to the mistrial:

I do not recall asking either counsel if they consented to a mistrial. I'm not the sort of judge that asked for permission or asked for consent. Generally in situations like this when I have made a decision--and the decision had been made--and my recollection is that I informed them that this is what I was going to do

5

and to please go in the courtroom and get the jury in there as quickly as possible.

Love v. Morton, 944 F. Supp. at 381 n.3. 7

After his conversation with Judge Braithwaite, Judge Citta notified counsel that he would declare a mistrial, and counsel returned to the courtroom. Defense counsel later testified that the time between his return to the courtroom and the judge's return was "five to ten minutes at the most." Judge Citta addressed the jury:

Ladies and gentleman, I am going to declare a mistrial in this case. It has nothing to do with either of the litigants, their--the attorneys or the defendant or you. I just received a phone call that my mother-in-law passed away this afternoon, and I have some things I must attend to as a result of that, and I will not be available for the rest of this week. Due to the scheduling problems--normally what I would do is I would continue the case and dismiss you for the balance of this week and have you come back next week and we would finish it, but due to some scheduling problems that obviously could not be anticipated and the difficulty that it causes for various witnesses in the case, I'm going to declare a mistrial.

State v. Love, 660 A.2d at 1248. After declaring the mistrial, Judge Citta immediately returned to his chambers. He left the courthouse shortly thereafter. The prosecutor gave fifteen minutes as a "ballpark estimate" of the time that expired between the call from Judge Citta's wife and the time Judge Citta left the courtroom.

At the time Judge Citta declared the mistrial, another judge, Judge Alvarez, was available to complete the trial. In fact, Judge Alvarez had been a spectator in the courtroom during some of the day's proceedings. Nevertheless, Judge Braithwaite instructed counsel to return the following morning to pick a new jury. Later that afternoon, Judge Braithwaite assigned Judge Alvarez to begin a new trial in the morning.

When asked during the district court hearing whether he had considered prior to declaring a mistrial that "there

6

might be double jeopardy problems," Judge Citta replied: "Never crossed my mind, no." Apparently no one else involved in this case considered the possibility of double jeopardy until defense counsel returned to his office and began discussing the case with his colleagues. At that point he began to realize the potential implications of the mistrial. The following morning, defense counsel asked Judge Alvarez to dismiss the charges on double jeopardy grounds. Judge Alvarez denied the motion, the trial proceeded, and Love was convicted and sentenced to 30 years.

Love appealed to the Superior Court Appellate Division, arguing that his conviction was invalid because his second trial violated double jeopardy principles. State v. Love, 660 A.2d at 1247. In affirming Love's conviction, the Appellate Division emphasized that Love's mistrial was not the result of bad faith or improper motive on the part of the trial judge or the prosecuting attorney. Id. The New Jersey Supreme Court denied certification. State v. Love, 142 N.J. 572, 667 A.2d 189 (1995).

The district court proceedings followed. After examining the record and conducting an evidentiary hearing, the court determined that Love's conviction was invalid. The court found that the mistrial was not required by manifest necessity, and that defense counsel's failure to object did not constitute implied consent. The court granted Love's petition for habeas relief, but stayed issuance of the writ pending the result of this appeal.

II.

Before addressing the double jeopardy issue, we will consider whether it was proper for the district court to conduct an evidentiary hearing. New Jersey suggests that an evidentiary hearing was improper in light of the recent 28 U.S.C. § 2254 amendments included in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996). Section 2254(e)(2) now provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall

7

not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

 (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts of the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Love filed his § 2254 petition on December 5, 1995. Congress enacted the amendments on April 24, 1996. As we stated in Burkett v. Love, 89 F.3d 135, 138 (3d Cir. 1996), "we need not digress to determine the effect of [the 1996 amendments] on the present action, filed, as it was, before the amendments were enacted." See also Boria v. Keane, 90 F.3d 36, 37-38 (2d Cir. 1996) (per curiam) (because the death penalty sections contain an explicitly retroactive provision and the other sections do not, Congress intended the latter to have only prospective effect). But see Lindh v. Murphy, 96 F.3d 856 (7th Cir. 1996) (en banc), cert. granted, 117 S. Ct. 726 (1997).

Even if we were to give retroactive effect to the 1996 amendments to § 2254, we would not conclude that the district court erred in conducting an evidentiary hearing.2 Section 2254(e)(2) applies to applicants who "failed to

---

2. The district court, without discussion, also concluded that an evidentiary hearing would be appropriate under the 1996 amendments: "Adopting the majority view on retroactivity, the Court need not revisit its decision to order an evidentiary hearing beyond noting that the Court would have ordered an evidentiary hearing under the new 28 U.S.C. § 2254(e)(2) as well." 944 F. Supp. at 381 n.1.

8

develop the factual basis of a claim in State court proceedings." In this case, Love did not "fail" to develop the basis of his claim.

Judge Citta's abrupt declaration of a mistrial made it impossible for Love to develop the record at the time of the mistrial. Neither defense counsel nor the prosecuting attorney was given the time or opportunity to comment on the mistrial decision or to suggest that the decision be delayed until the next morning. In the words of the prosecutor: "I mean there was an urgency and an emergent situation here that none of us had previously encountered." Following the judge's decision to declare a mistrial, the attorneys were ordered to return to the courtroom for the sole purpose of the court's notification to the jury that the trial was aborted. Under these circumstances, we conclude that Love was unable to develop the basis of his claim at trial.

The following morning, Love's counsel moved to dismiss the indictment on double jeopardy grounds. Defense counsel and the prosecutor gave narrative accounts of the events of the previous afternoon and the trial court deemed these accounts to be a satisfactory basis for denying the motion, thus ending the double jeopardy matter at the trial level. Love was unable to fully develop the factual basis of his claim at that time because of Judge Citta's unavailability. Love had no opportunity at that point to inquire, as he later did in the federal hearing, into the judge's consideration of the available alternatives to a mistrial.

Similarly, we conclude that Love was unable to develop the basis of his claim in state court post-conviction proceedings. In New Jersey "an issue may not be considered in post-conviction relief proceedings if the question was decided on direct appeal." State v. Bontempo, 170 N.J. Super. 220, 233, 406 A.2d 203 (1979) (citing State v. Johnson, 43 N.J. 572, 592, 206 A.2d 737 (1965)); see N.J. Cr. R. 3:22-5 Bar of Ground Expressly Adjudicated. After the Appellate Division affirmed Love's conviction on the basis of the limited trial court record, Love could not raise the double jeopardy issue and present additional evidence in a post-conviction proceeding.

9

Under these circumstances we are unwilling to conclude that Love failed to develop the factual basis of his claim in the state court proceedings. We conclude that factors other than the defendant's action prevented a factual record from being developed. See Statement by President William J. Clinton Upon Signing S. 1965, 32 Weekly Compilation of Presidential Documents 719 (April 29, 1996) (#AB AD8E# 2254(e)(2)] is not triggered when some factor that is not fairly attributable to the applicant prevented evidence from being developed in State court."). Although the President's statement is not evidence of congressional intent, we refer to it because we agree with his interpretation of the plain language of § 2254(e)(2), and we find no contrary interpretation in the legislative history of the 1996 amendments to § 2254.

III.

Jeopardy attached when the first jury was empaneled and sworn. See Crist v. Bretz, 437 U.S. 28, 35-38 (1978). Termination of proceedings after jeopardy attaches, without defendant's consent by motion or otherwise, may bar reprosecution. United States v. Jorn, 400 U.S. 470 (1971). Our jurisprudence does not prohibit retrial following termination if a defendant consents or waives the right to assert double jeopardy, or when there is manifest necessity to terminate the first trial. Oregon v. Kennedy, 456 U.S. 667, 673 (1982); Arizona v. Washington, 434 U.S. 497 (1978); United States v. Dinitz, 424 U.S. 600 (1976); Illinois v. Somerville, 410 U.S. 458 (1973).

We now consider whether the mistrial was required by manifest necessity. To demonstrate manifest necessity, the state must show that under the circumstances the trial judge "had no alternative to the declaration of a mistrial." United States v. McKoy, 591 F.2d 218, 222 (3d Cir. 1979). The trial judge must consider and exhaust all other possibilities. Id.

Love argues that the court failed to exhaust the possibilities of (1) excusing the jury overnight so the parties could explore the option of continuing the trial with the same jury and a different judge; and (2) continuing the trial

10

with Judge Alvarez and the same jury the next day, or as soon as Judge Alvarez could familiarize herself with the trial transcript.

Love explains that the New Jersey Rules of Court provide for the substitution of judges in situations such as this. Rule 1:12-3(b) provides that upon the disability of a judge during trial:

another judge may be designated to complete the trial as if having presided from its commencement, provided, however, that the substituted judge is able to become familiar with the proceedings and all of the testimony therein through a complete transcript thereof.

Judge Alvarez was available to begin trial the same afternoon that Judge Citta declared a mistrial, or the following morning. Judge Alvarez could easily have become familiar with the transcript because she was present in the courtroom during parts of the trial, the transcript consisted only of 122 pages and the tape recording covered only three hours. The brute fact is that under Rule 1:12-3(b), Judge Alvarez could have been designated to complete the trial the next morning as easily as starting a second trial.

The State argues that the district court had rational reasons for rejecting the alternatives to mistrial. The State suggests that the alternative of excusing the jury overnight was properly rejected because the court would not have been able to tell the jury how long the trial would be delayed. The State also argues that it would have been incongruous to substitute a new judge into a case in which another judge had made various evidentiary rulings, and that it would have been particularly inappropriate to substitute Judge Alvarez into a trial "mid-stream" because she was new to the bench.

We are not impressed by these arguments. They do not make out a case of manifest necessity. A mistrial is not manifestly necessary when the testimony lasts less than one full day, and a judge who has observed part of the trial is available to resume the proceedings the next morning. As a matter of law, declaring a mistrial in this case was not manifestly necessary when the decision to declare a mistrial

11

vel non could have been postponed to the next morning. The delay would have given both the prosecutor and defense counsel, as well as the court, adequate time to consider alternative solutions to the sudden emergency. All judicial decisions should be based on calm deliberation. When it comes to decisions squarely implicating the serious consequences of the Double Jeopardy Clause, the necessity for collected and composed contemplation assumes a fortiori proportions. There was no legitimate reason for making the mistrial decision during a time of distraught distraction. The court could have easily rendered a decision the next morning through one of three judicial officers: the original trial judge, the presiding criminal court judge or the judge who presided at the second trial. At that time, the alternatives for aborting the trial or completing it with a new judge could have been properly considered.

IV.

Having concluded that the mistrial was not manifestly necessary, we now consider whether Love's counsel consented to the mistrial by failing to raise an objection.

Mistrials declared with the defendant's consent do not bar later prosecution. United States v. Dinitz, 424 U.S. 600, 607 (1976). The courts of appeals have taken different approaches in determining whether defense counsel's failure to object to a mistrial constitutes implied consent. The First, Fourth, Fifth, Seventh and Eleventh Circuits have adopted a rule that defendants give implied consent to a mistrial if they have an opportunity to object but fail to do so. See United States v. DiPietro, 936 F.2d 6, 9-10 (1st Cir. 1991); United States v. Ham, 58 F.3d 78, 83 (4th Cir. 1995); United States v. Nichols, 977 F.2d 972, 974 (5th Cir. 1992); Camden v. Circuit Court, 892 F.2d 610, 615 (7th Cir. 1989); United States v. Puleo, 817 F.2d 702, 705 (11th Cir. 1987). At the other extreme, the Sixth and the Ninth Circuits refuse to infer consent without some positive manifestation of acquiescence by the defense. See, e.g., Glover v. McMackin, 950 F.2d 1236, 1240 (6th Cir. 1991); Weston v. Kernan, 50 F.3d 633, 637 (9th Cir. 1995).

Although this court has not decided the issue in ipsissimis verbis, the teachings of United States ex. rel.

12

Russo v. Superior Court, 483 F.2d 7 (3d Cir. 1973), give persuasive direction. Russo involved a mistrial caused by jury deadlock. After the jury deliberated for several days without reaching a verdict, the judge called the jury to the courtroom and declared a mistrial without any advance notice to counsel. The defendant was retried and convicted. When we received the case on appeal from a grant of federal habeas corpus relief, we held that the Double Jeopardy Clause prohibited a second trial. On the question of implied consent, we said:

While the better practice may be to object as soon as counsel learns that a mistrial is to be granted, appellant's counsel was in a difficult situation. He had no advance warning or notice that a mistrial was to be declared . . . The Supreme Court's conclusion in United States v. Jorn may also be applicable in this situation:

`. . . [I]ndeed, the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so.'

Also, to have objected in front of the jury might have prejudiced appellant for trying to "show up" the trial judge, especially if some members of the jury actually wanted to go home despite their civic obligation. In this situation, we cannot penalize appellant for failing to object sooner.

Id. at 17 (citations omitted).

It is clear from our holding in Russo that we will not infer consent from defense counsel's silence unless there was some opportunity to object. What constitutes adequate opportunity, however, is a question which we must decide here. Love contends that his counsel did not have a meaningful opportunity to object because of the "emotionally charged atmosphere of the courtroom."

Given the constitutional dimension of a double jeopardy violation, we must proceed with caution in inferring consent from counsel's failure to object. Our previously stated admonition reminds us that close cases regarding

13

the propriety of a mistrial "should be resolved in favor of the liberty of a citizen." Russo, 483 F.2d at 17.

Under the circumstances of this case, we conclude that Love's counsel did not have a meaningful opportunity to object to the trial judge's declaration of a mistrial. First, the judge made no inquiry of counsel regarding the propriety of a mistrial. He did not invite their comments or ask them to propose alternatives. Cf. United States v. Buljubasic, 808 F.2d 1260, 1265-1266 (7th Cir. 1987) ("If a judge should say: `I think a mistrial would be a good idea, but think this over and let me know if you disagree', the defendant's silence would be assent.").

Second, the judge returned to the courtroom to declare a mistrial only five or ten minutes after informing counsel of his intent to do so. In other circumstances, this window of time might be adequate. In this case, however, given the suddenness of the mistrial declaration and the hectic atmosphere surrounding the proceedings, the brief period of time afforded little meaningful opportunity for thoughtful and reflective decision-making.

Third, when the judge declared the mistrial and dismissed the jury, he immediately returned to his chambers and quickly left the courthouse. The judge's swift departure did not afford a reasonable opportunity to raise an objection. See United States v. Bates, 917 F.2d 388, 393 (9th Cir. 1990) (finding no consent where judge declared a mistrial, left the courtroom and ignored defendant's request for a sidebar); Lovinger v. Circuit Court, 845 F.2d 739, 744 (7th Cir. 1988) ("It appears from the record that the judge actually left the courtroom as he finished his statement. He was gone before the defense had any reasonable opportunity to consider the import of his statement and act upon it.").

Fourth, the atmosphere of the proceedings would have made it difficult to object, even if it had occurred to defense counsel to do so. We agree with the district court's assessment: "although objecting to Judge Citta's mistrial declaration could have been accomplished with due care and respect, Judge Citta's grief and the urgency of his familial obligations made such a feat considerably more difficult." 944 F. Supp at 386-387.

14

After considering all the circumstances, we conclude that Love had no meaningful opportunity to object to the declaration of a mistrial. Accordingly, there was no implied consent. Because there was no manifest necessity to declare the mistrial, and no express or implied consent to the mistrial by the defendant, we perceive no exception to the Double Jeopardy Clause's requirement that an individual may not be subjected "to hazards of trial and possible conviction more than once for an alleged offense." Green v. United States, 355 U.S. 184, 187 (1957).

We have considered all arguments presented by the parties and conclude that no further discussion is necessary.

The judgment of the district court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

15